respondent violated disciplinary rule § 3-318, conduct rules §§ 3-503.3(a) and 3-508.4(a) and (d), and his oath of office as an attorney licensed to practice law in the State of Nebraska. Respondent has waived all additional proceedings against him in connection herewith. Upon due consideration, the court approves the conditional admission and enters the orders as indicated below.

## CONCLUSION

Respondent is publically reprimanded. Respondent is directed to pay costs and expenses in accordance with Neb. Ct. R. §§ 3-310(P) and 3-323(B) within 60 days after the order imposing costs and expenses, if any, is entered by the court.

JUDGMENT OF PUBLIC REPRIMAND.

---

STATE OF NEBRASKA, APPELLEE, V.
RYAN M. ELSEMAN, APPELLANT.
___ N.W.2d ___

Filed January 3, 2014.    No. S-12-1077.

1. **Trial: Evidence: Appeal and Error.** Because authentication rulings are necessarily fact specific, a trial court has discretion to determine whether evidence has been properly authenticated. An appellate court reviews a trial court's ruling on authentication for abuse of discretion.

2. **Criminal Law: Directed Verdict.** In a criminal case, a court can direct a verdict only when there is a complete failure of evidence to establish an essential element of the crime charged or the evidence is so doubtful in character, lacking probative value, that a finding of guilt based on such evidence cannot be sustained. If there is any evidence which will sustain a finding for the party against whom a motion for directed verdict is made, the case may not be decided as a matter of law, and a verdict may not be directed.

3. **Criminal Law: Convictions: Evidence: Appeal and Error.** In reviewing a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

4. **Rules of Evidence: Proof.** Neb. Evid. R. 901, Neb. Rev. Stat. § 27-901(1) (Reissue 2008), does not impose a high hurdle for authentication or identification. A proponent of evidence is not required to conclusively prove the genuineness of the evidence or to rule out all possibilities inconsistent with authenticity. If the proponent's showing is sufficient to support a finding that the evidence is what it purports to be, the proponent has satisfied the requirement of rule 901(1).

Appeal from the District Court for Douglas County: J. Michael Coffey, Judge. Affirmed.

Donald L. Schense, of Law Office of Donald L. Schense, for appellant.

Jon Bruning, Attorney General, and Kimberly A. Klein for appellee.

Heavican, C.J., Wright, Connolly, Stephan, Miller-Lerman, and Cassel, JJ.

Miller-Lerman, J.

## NATURE OF CASE

Ryan M. Elseman appeals his convictions in the district court for Douglas County of first degree murder and use of a deadly weapon to commit a felony. Elseman claims that the court erroneously admitted evidence regarding the content of certain text messages. He also claims that the court committed plain error when it overruled his motions for a directed verdict and that there was not sufficient evidence to support his convictions. We affirm Elseman's convictions and sentences.

## STATEMENT OF FACTS

The charges against Elseman arose from an incident in which he shot and killed Kristopher Winters. The State alleged that Elseman shot Winters during an attempted robbery.

Elseman was among a group of people who were at the home of Nicholas Ely on July 6, 2011. Elseman's girlfriend's sister, Emily G., was also part of the group. Elseman left the house with Emily, Ely, and Marqus Patton with a plan to go swimming at Patton's apartment complex. The four were picked up by Drake Northrop. Emily had previously bought marijuana from Winters, and she suggested that the group go

to Winters' house to get some marijuana. At some point, it was decided that the group would rob Winters.

Emily directed Northrop to Winters' house, and they arrived there around noon. There was no response when Emily knocked on Winters' door, but a friend of Winters arrived at the door. Emily went into the house with the friend after she told him she was there to buy marijuana. Once inside, Emily sent Elseman a text message saying, "I'm in." She sent another message saying that Winters had a friend with him and that the doors were open.

Northrop, Elseman, Ely, and Patton entered the house through an open door. Elseman and Patton had guns. The men walked into a room occupied by Winters and his friend. Elseman pointed his gun and said, "'You know what it is.'" When Winters charged Elseman, Patton used his gun to hit Winters in the head. Winters stumbled but then pushed Patton up against a wall. Patton told Elseman to shoot Winters, and Elseman did. After the shots were fired, Northrop, Elseman, Ely, and Patton ran out of the house and drove away, leaving Emily behind. Northrop dropped the other three off at Patton's apartment.

Winters died as a result of the gunshot wounds, and Elseman was charged with first degree murder and use of a deadly weapon to commit a felony. The first degree murder count was charged alternatively as premeditated murder and as felony murder. The State's witnesses at Elseman's trial included Emily and Northrop. Neither Patton nor Ely testified at Elseman's trial.

Emily testified that while the group was driving to Winters' house, she was talking to her sister on a cell phone and overheard others in the car talking about a robbery. She testified that she had been told to send a text message to let Elseman know when she got into the house and to let him know whether the doors were open and how many people were in the house. Emily could not recall whether it was Elseman or someone else who had told her to send the text messages.

Emily testified that although she heard what sounded like gunshots when she was in the basement of Winters' house, she was not in a position to see the shooting. After hearing the

gunshots, she saw that Winters was holding his neck and she saw blood. She testified that she left the house and that as she was walking away, she received a text message from Elseman telling her to "get out of there because there was like a lot of cops around." She testified that Elseman also texted to her a telephone number she was to call to have "somebody that wouldn't snitch pick [her] up." Before Emily could meet up with that person, the police stopped her and spoke with her and eventually took her to the police station.

During Emily's testimony, the State asked questions about the cell phone she used to send text messages to Elseman. Emily testified that she had Elseman's number programmed into the cell phone, but that she did not recall his number. After establishing that Emily could refresh her memory of Elseman's number by looking at her cell phone, the State gave her the phone to check her contact list for Elseman's number. When the State asked Emily what Elseman's number was, Elseman objected based on foundation and argued that there was no evidence regarding the chain of custody of the cell phone. The court initially sustained the objection but overruled it after the State argued that the cell phone was being used only for the purpose of refreshing Emily's memory of Elseman's telephone number. Emily then recited Elseman's number based on her memory that had been refreshed by viewing the contact list on the cell phone.

Northrop testified that on July 6, 2011, Ely asked Northrop to give him a ride to Patton's apartment to go swimming. Northrop went to Ely's house to pick him up; Northrop also gave a ride to Patton, Elseman, and Emily. Patton sat in the front passenger seat, and Ely and Elseman sat in the back, with Emily in the middle. Northrop testified that during the drive, he agreed to go along with a plan to "go to a house and hit a lick." Northrop testified that "hit a lick" meant a robbery. He also testified that the plan was made by Ely, Emily, and Elseman. He specifically testified that Elseman said that "it would be easy, and the guy wouldn't fight back."

Emily directed Northrop to the house. Northrop heard Emily and Elseman make a plan that Emily would get into the house and would leave the doors unlocked or open and then send a

text message to Elseman to let them know how many people were inside. The four men waited outside while Emily went to the house. Northrop testified that while they were waiting, he saw Elseman look at his cell phone and then Elseman told the others that Emily had the doors open and that there were two people inside.

Northrop, Elseman, Ely, and Patton entered the house through a garage door. After they entered the house, Northrop saw that Elseman and Patton had guns. The four walked down a hallway, and when they reached a room at the end of the hallway, Elseman walked into the room first. Northrop saw Elseman point a gun and heard him say, "'You know what it is.'" Northrop then saw Winters "attack" Elseman by "kind of like grabbing him to wrestle with him." Northrop testified that Patton "pistol-whipped" Winters, which Northrop testified entailed Patton's hitting Winters in the head with the butt of Patton's gun. Northrop saw Winters stumble back and grab a chair, and then he saw Winters use the chair to ram Patton against the wall. Northrop testified that at that point, Patton told Elseman to shoot Winters. Elseman then shot Winters. Northrop saw Winters fall onto some steps, and then Northrop, Elseman, Ely, and Patton ran out of the house and back to Northrop's vehicle.

Northrop drove the men away from Winters' house and to Patton's apartment. While driving, Northrop observed Elseman making calls and sending text messages in an attempt to find someone to pick up Emily. Northrop dropped Elseman, Ely, and Patton at Patton's apartment and then went to his girl-friend's house.

Nicholas Palma testified that on July 6, 2011, he made plans to go swimming with his friends Ely and Patton. Before he left to go swimming at Patton's apartment complex, he received a call from Ely and the plan was changed such that Palma was to pick up Emily, whom Palma had met the night before at Ely's home. Palma did not find Emily at the location he had been told he would find her, and so he went to Patton's apartment. When he got there, he saw Elseman, Ely, and Patton. Palma testified that while they were talking about events that had occurred earlier in the day, Elseman "[s]aid that he had shot

somebody in the neck" and "that he wouldn't let his homeys take the charge for this. He would do life."

The State also presented testimony by law enforcement officers who investigated Winters' killing. Some of the testimony focused on text messages sent between individuals involved with the attempted robbery and shooting. Nicholas Herfordt, an Omaha police officer, testified regarding his training with respect to extracting data from cell phones. As part of the investigation of Winters' killing and the attempted robbery, Herfordt recovered data from the cell phones of the parties, including Emily, who were involved in the incident. Herfordt testified regarding the procedures he used to extract data. Herfordt stated on cross-examination that the information he could retrieve from a cell phone would not indicate who had made or received a particular call.

Donald Ficenec, a sergeant with the Omaha Police Department, testified that as part of the investigation of Winters' death, Ficenec compiled telephone records that had been obtained for various persons involved in the case. Such records showed the date and time of voice calls made between cell phones, but did not show the content of such calls. With regard to text messages, the records showed the content as well as the date and time.

Ficenec testified regarding the date, time, and duration of certain telephone calls and the date, time, and content of text messages that were relevant to this case. Ficenec testified regarding text messages sent between Emily's and Elseman's cell phones around the time that Winters was shot. Elseman made foundation objections to certain questions regarding the content of text messages sent from Elseman's cell phone to Emily's cell phone. The court overruled the objections. On cross-examination, Ficenec stated that although the telephone records could tell the content of text messages and the date and time the messages were sent, the records did not name the specific person who sent and received the messages, only the telephone numbers from which and to which the messages were sent.

Dave Schneider, a police detective on the team that investigated Winters' death, testified that he had obtained a search

warrant for Emily's cell phone and that he had looked through the contents of the phone. He documented certain text messages that he observed on Emily's cell phone, particularly those around the time that Winters was shot. He noted certain messages to a person that was listed in Emily's contact list under the name "Ryan." Elseman objected based on foundation to the State's questions regarding the content of text messages sent from Emily's cell phone to the contact listed as "Ryan" and from the contact listed as "Ryan" to Emily's cell phone. The court overruled Elseman's objections.

A coroner's physician who performed the autopsy on Winters testified that Winters had a gunshot wound that indicated a bullet had entered the right back side of Winters' head and exited left of the center of his chin. The physician testified that the bullet partially severed Winters' carotid artery, which caused significant hemorrhaging and ultimately caused Winters to bleed to death.

After the State rested its case, Elseman moved for a directed verdict on both counts. The district court sustained the motion with regard to the premeditated murder alternative for the first degree murder charge but overruled the motion as to felony murder and use of a deadly weapon to commit a felony charges. Elseman chose not to testify in his defense, and he rested his defense without presenting any evidence. Elseman renewed his motion for a directed verdict as to the remaining charges, and the court overruled the motion.

The court instructed the jury with regard to felony murder and use of a deadly weapon to commit a felony. After deliberations, the jury returned verdicts of guilty on both counts. The court thereafter sentenced Elseman to consecutive terms of imprisonment for life for the murder conviction and for 25 to 30 years for the use of a weapon conviction.

Elseman appeals his convictions.

## ASSIGNMENTS OF ERROR

Elseman claims, renumbered and restated, that the district court erred (1) when it admitted evidence of the content of text messages sent to and from Elseman and (2) when it overruled his motions for directed verdict on felony murder and use of a

deadly weapon to commit a felony. He also claims that there was not sufficient evidence to support his convictions.

## STANDARDS OF REVIEW

[1] Because authentication rulings are necessarily fact specific, a trial court has discretion to determine whether evidence has been properly authenticated. We review a trial court's ruling on authentication for abuse of discretion. *State v. Nolan*, 283 Neb. 50, 807 N.W.2d 520 (2012), *cert. denied* ___ U.S. ___, 133 S. Ct. 158, 184 L. Ed. 2d 78.

[2] In a criminal case, a court can direct a verdict only when there is a complete failure of evidence to establish an essential element of the crime charged or the evidence is so doubtful in character, lacking probative value, that a finding of guilt based on such evidence cannot be sustained. *State v. Eagle Bull*, 285 Neb. 369, 827 N.W.2d 466 (2013). If there is any evidence which will sustain a finding for the party against whom a motion for directed verdict is made, the case may not be decided as a matter of law, and a verdict may not be directed. *Id*.

[3] In reviewing a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. *Id*. The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id*.

## ANALYSIS

*The Content of Text Messages*
*Was Authenticated.*

Elseman first claims that the court erred when it admitted evidence regarding the content of text messages sent to and from Elseman's cell phone around the time of the killing because the text message evidence was admitted without satisfying the authentication requirement of Neb. Evid. R. 901,

Neb. Rev. Stat. § 27-901(1) (Reissue 2008). Rule 901 states, in relevant part: "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." We determine that the authentication requirement was met, and there is no error in this regard.

[4] We have stated that rule 901 does not impose a high hurdle for authentication or identification. *State v. Taylor*, 282 Neb. 297, 803 N.W.2d 746 (2011). A proponent of evidence is not required to conclusively prove the genuineness of the evidence or to rule out all possibilities inconsistent with authenticity. *Id*. If the proponent's showing is sufficient to support a finding that the evidence is what it purports to be, the proponent has satisfied the requirement of rule 901(1). *Id*.

The evidence about which Elseman complains includes Emily's testimony regarding the content of text messages sent between herself and Elseman near the time Winters was killed. He also complains of evidence about which police investigators testified regarding text messages found on Emily's cell phone. Elseman's concern stems from the fact that it could not be ruled out that some other person sent or received the messages while using Elseman's cell phone.

In *State v. Pullens*, 281 Neb. 828, 800 N.W.2d 202 (2011), we considered a rule 901 challenge to the admission of evidence of the content of e-mail correspondence purportedly written by the defendant. We stated that e-mails could be authenticated by evidence such as

> the e-mail address[, t]he signature or name of the sender or recipient in the body of the e-mail[, e]vidence that an e-mail is a timely response to an earlier message addressed to the purported sender[, or] the contents of the e-mail and other circumstances [that] may be utilized to show its authorship.

281 Neb. at 860, 800 N.W.2d at 229. We further stated in *Pullens* that "[t]he possibility of an alteration or misuse by another of the e-mail address generally goes to weight, not admissibility." *Id*.

The reasoning we used with regard to the evidence of e-mail correspondence in *Pullens* applies to the rule 901 challenge to the evidence of the content of text messages in this case. Under rule 901, the State as the proponent of the evidence was not required to conclusively prove that Elseman authored the messages or to rule out that someone else may have written the messages using Elseman's cell phone. Courts in other jurisdictions have held that electronic messages such as e-mails and text messages may be authenticated by circumstantial evidence establishing that the evidence was what the proponent claimed it to be. See *State v. Thompson*, 777 N.W.2d 617 (N.D. 2010) (collecting cases). We determine that in this case, the State provided sufficient evidence to authenticate the text messages.

With regard to the specific evidence of which Elseman complains, we note that Emily testified regarding Elseman's telephone number based on her own memory, which was refreshed by looking at her cell phone. She also testified from her own memory regarding the content of text messages between herself and Elseman. It was clear that the foundation for Emily's testimony was her own memory regarding messages she had sent to and received from Elseman. Rule 901, upon which Elseman relies on appeal, did not prohibit Emily from testifying regarding her memory of messages sent between herself and Elseman.

Elseman also complains of the testimony of three law enforcement offiers involved in the investigation in this case—Herfordt, Ficenec, and Schneider. Herfordt testified only to the techniques he used to extract data from Emily's cell phone; he did not testify regarding the content of text messages, and Elseman made no objection based on foundation or authentication regarding Herfordt's testimony. Elseman notes and we recognize that Herfordt testified that data extracted from the cell phone did not indicate who actually sent the messages. The jury was allowed to take this testimony into consideration. Elseman shows no error in the court's allowing Herfordt's testimony.

Ficenec and Schneider testified regarding the content of text messages extracted from Emily's cell phone. The two

witnesses testified regarding the content of text messages and the telephone numbers from which and to which messages were sent. Although the number from which messages were sent and received was the number that Emily identified as belonging to Elseman, neither law enforcement officer testified that it was Elseman who sent the message, and both conceded that the data extracted from the cell phone could not verify who sent the message. The officers provided testimony regarding how they obtained the information extracted from the cell phone.

Because the officers testified regarding messages sent between only certain numbers and they did not purport to identify the specific persons who sent the messages, we determine that rule 901, upon which Elseman relies on appeal, did not prohibit the court from admitting such testimony. For purposes of rule 901, there was sufficient testimony to establish that the evidence was what the State claimed it to be—messages sent between certain telephone numbers. It was then within the jury's province to determine whether it could be reasonably inferred that Elseman sent or received the messages.

The authentication requirement of rule 901 was met, and we determine that the district court did not err on the basis of rule 901 when it admitted testimony by Emily and by the police officers regarding the content of the text messages. We reject this assignment of error.

*There Was Sufficient Evidence to*
*Support Elseman's Convictions.*

Elseman claims that the district court erred when it overruled his motions for directed verdict on the charges of felony murder and use of a deadly weapon to commit a felony and, in any event, that there was not sufficient evidence to support his convictions. We find no merit to these claims.

In considering Elseman's assigned error regarding the amount of evidence, we note that where a defendant in a criminal case has moved for a directed verdict which is overruled and the defendant does not put on evidence, he or she has preserved the ruling for appeal, as Elseman did

in this case. Cf. *State v. Seberger*, 284 Neb. 40, 815 N.W.2d 910 (2012).

In this case, Elseman twice unsuccessfully moved for directed verdict. In a criminal case, a court can direct a verdict only when there is a complete failure of evidence to establish an essential element of the crime charged or the evidence is so doubtful in character, lacking probative value, that a finding of guilt based on such evidence cannot be sustained. *State v. Eagle Bull*, 285 Neb. 369, 827 N.W.2d 466 (2013). If there is any evidence which will sustain a finding for the party against whom a motion for directed verdict is made, the case may not be decided as a matter of law, and a verdict may not be directed. *Id*. Referring to our statement of facts and as recited below in our sufficiency of the evidence analysis, there is evidence which would sustain a finding for the State against whom the motions for directed verdict were made. We cannot say as a matter of law that the case should not have been submitted to the jury. The overrulings of Elseman's motions for directed verdict were not error.

Elseman next challenges the sufficiency of the evidence. In his appellant's brief, Elseman makes only general assertions that there was not enough evidence to support his convictions. Elseman does not identify specific elements of either crime of which he was convicted that were not proved. Accordingly, we give an overview of the evidence and we find it sufficient.

Elseman was convicted of first degree murder and use of a weapon to commit a felony. The court directed a verdict in favor of Elseman with regard to the premeditated murder alternative for first degree murder; but with regard to the felony murder alternative, the jury was correctly instructed that in order to find Elseman guilty of first degree felony murder, it needed to find that Elseman intended to commit a robbery and that in the course of committing or attempting to commit that robbery, Elseman killed Winters. The jury was correctly instructed that in order to find Elseman guilty of use of a deadly weapon to commit a felony, it must find that Elseman committed first degree murder and that he intentionally used a deadly weapon in the commission of the murder.

There was testimony from witnesses in this case that, if believed by the jury, established that Elseman intended to rob Winters; that during the attempted commission of that robbery, Elseman shot and killed Winters; and that Elseman intentionally used a deadly weapon to shoot Winters. We note particularly the testimony of Emily, Northrop, and Palma recounted in our statement of facts. Such testimony indicated that Elseman and others formed a plan to rob Winters and that they took steps to carry out the robbery, including gaining access to Winters' house. There was evidence which shows that while in Winters' house to carry out the robbery, Elseman used a gun to shoot Winters and that Winters died from the gunshot wounds inflicted by Elseman.

The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Eagle Bull, supra*. The evidence admitted in this case was sufficient to support Elseman's convictions for first degree murder and use of a deadly weapon to commit a felony. We find no merit to this assignment of error.

## CONCLUSION

Because the content of the text messages was properly authenticated under rule 901, we conclude that the district court did not err on this basis when it admitted evidence regarding the content of text messages between Elseman and Emily. We conclude the district court did not err when it overruled Elseman's motions for directed verdict. We further conclude that there was sufficient evidence to support Elseman's convictions. We affirm Elseman's convictions and sentences for first degree murder and use of a deadly weapon to commit a felony.

Affirmed.

McCormack, J., participating on briefs.